**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SDP Kyrene LLC, | No. CV-22-00987-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Kyrene Shopping Center LLC, et al., | |
| Defendants. | |

Plaintiff SDP Kyrene LLC's ("SDP") predecessor-in-interest[1] and Defendant Kyrene Shopping Center LLC ("Kyrene") entered into an Agreement for the Purchase and Sale of Property (the "PSA"). Kyrene agreed to sell commercial property located on West Chandler Boulevard in Chandler, Arizona (the "Property") to SDP. One of the Property's commercial tenants is Defendant LA Laser Center PC ("LA Laser"). The parties, all of whom are sophisticated entities and were represented by counsel, negotiated and agreed to the terms, the conditions, and the remedies outlined in the twenty-six-page PSA.

Prior to closing, the deal soured and fell apart. SDP sued, alleging that Kyrene breached the PSA when it refused to close the transaction. It now seeks both specific performance and damages. SDP says that Kyrene used every opportunity it could to obstruct the deal because it received a better offer. Kyrene's main defenses are that SDP materially breached the PSA, which discharged Kyrene of its obligations under the

---

[1] On November 17, 2021, SDP's predecessor in interest, SDP 44, LLC ("SDP 44"), entered into a written agreement (the "PSA") with Kyrene to purchase the Property. (Doc. 228-4 at 2–26.) SDP 44 later assigned its interest in the PSA to SDP. (Doc. 160-2.) In this Order, "SDP" or "Plaintiff" also includes "SDP 44" unless otherwise noted.

agreement. Kyrene also argues that SDP fraudulently induced it to enter the PSA.

Now pending before the Court are SDP's Motion for Partial Summary Judgment (Doc. 225) and Kyrene and LA Laser's (the "Defendants") Motion for Partial Summary Judgment (Doc. 228). For the reasons listed below, the Court will grant in part, and deny in part, both motions.

## I.   BACKGROUND

Many of the key facts have been previously detailed in prior Orders and are largely undisputed. (Doc. 132.) Rather than repeat them, the Court will briefly discuss some facts below, and will fully detail the key PSA provisions, allegations, and facts in its discussion regarding each claim.

Pursuant to the PSA, the parties agreed to a "Purchase Price" of $18 million, an "Effective Date" of November 17, 2021, and a "Closing Date" of May 16, 2022. (Doc. 228-4 at 2–3.) The parties also agreed to a "Feasibility Study Period" to range from November 17, 2021, to March 17, 2022. (*Id.* at 3.) The parties also defined "Purchaser Default" and "Seller Default." (*Id.* at 14–15.) Article 10.2 of the PSA identifies specific default events that could be triggered by Kyrene:

> The occurrence of any of the following prior or subsequent to Close of Escrow, shall be a '[Kyrene] Default' . . . (a) [t]he failure by [Kyrene] to deliver . . . the documents required to close Escrow . . . or (b) [t]he failure of [Kyrene] to perform any material act to be performed by it, to refrain from performing any material prohibited act or to fulfill any material condition to be fulfilled by it under this [PSA].

(Doc. 237-4 at 15.)

If Kyrene defaulted "prior to the Close of Escrow," SDP's "sole remedy shall be to pursue one, and only one, of the following remedies," (1) to waive the default, (2) to extend "the time for performance," (3) to terminate the PSA; or (4) to seek specific performance. (*Id.* at 16.)

After the closing fell through, SDP pursued specific performance as described in Article 10.4 of the PSA by filing suit in Arizona Superior Court. (Doc. 1-2.) Kyrene timely removed to this Court. (Doc. 1.) The next day, SDP moved for a temporary restraining

1    order and preliminary injunction. (Doc. 16.) The parties agreed to a temporary standstill.

2    (Doc. 28.) The Court then held an evidentiary hearing on SDP's motion for preliminary

3    injunction. The Court entered a preliminary injunction and ordered that "with respect to

4    the Property, [Kyrene] shall not (a) enter any new lease agreements; (b) renew or extend

5    any existing lease agreements; or (c) modify any existing lease agreements, until the matter

6    has been resolved by summary judgment or trial, or otherwise ordered by the Court."

7    (Doc. 132 at 13.)

8    **II.    STANDARD OF REVIEW**

9         "The court shall grant summary judgment if [a] movant shows that there is no

10   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

11   of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

12   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

13   in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

14   1119, 1125 (9th Cir. 2014). The Court "must view the evidence in the light most favorable

15   to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's

16   favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment

17   is improper 'where divergent ultimate inferences may reasonably be drawn from the

18   undisputed facts.'" *Fresno Motors*, 771 F.3d at 1125 (quoting *Miller v. Glenn Miller

19   Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006)).

20        A party moving for summary judgment "bears the initial responsibility of informing

21   the district court of the basis for its motion, and identifying those portions of [the record]

22   which it believes demonstrate the absence of a genuine issue of material fact." *Celotex

23   Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the

24   moving party must either produce evidence negating an essential element of the nonmoving

25   party's claim or defense or show that the nonmoving party does not have enough evidence

26   of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &

27   Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving

28   party carries its burden of production, the nonmoving party must produce evidence to

support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both motions when separately reviewing the merits of each. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal citation and quotations omitted). For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal citation and quotations omitted). The party without the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322–23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no

genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

## III.   DISCUSSION

SDP alleges the following claims for relief: (1) Breach of Contract against Kyrene, (2) Breach of the Implied Covenant of Good Faith and Fair Dealing against Kyrene, and (3) Promissory Estoppel against Kyrene and LA Laser. (Doc. 221 ¶¶ 11–71.) Kyrene counterclaims for a declaration that "if SDP acquires the Property under the PSA, the LA Laser Lease will survive, SDP will not have the right to either terminate the LA Laser Lease or lock LA Laser out." (Doc. 223 ¶ B.)

### A.   Breach of Contract

SDP moves for summary judgment solely on its claim that Kyrene breached the PSA. (Doc. 225 at 8.) "It is well established that, in an action based on breach of contract, the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages." *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004). There is no dispute that the PSA is a contract or that SDP has suffered damages by not acquiring the Property. (Docs. 225, 237.) SDP argues that Kyrene breached the PSA by refusing to provide adequate assurances and close the transaction. (Doc. 225 at 8–12; Doc. 225-6 at 26–28.) Kyrene, in turn, argues that it was under no obligation to provide adequate assurances and that, while it breached the PSA by not closing the sale, SDP's conduct excuses the breach. (Doc. 237 at 18–20.) Kyrene further argues that SDP fraudulently induced it to enter the PSA, which precludes summary judgment for SDP. (*Id.* at 8–11.)

#### 1.   Kyrene's Breach

Article 4.1(c) of the PSA requires Kyrene "to remove from the Property all mechanics liens arising from Seller's work, and deeds of trust or mortgages." (Doc. 237-4 at 6.) Articles 5.2(c) and (d) also require Kyrene deliver to the "Escrow Holder an assignment of the Contracts and Leases . . . and a Bill of Sale . . . together with the

settlement statement and any other documents or affidavits required by the Title Company in order to consummate the sale of the Property to [SDP] and issuance of the Title Policy" and to deposit "with the Escrow Holder the Deed in the form of Exhibit B . . . duly executed and acknowledged." (*Id.* at 6–7.)

The deposition transcripts for Kyrene's representative, Mitchell Stipp, and First American Title Insurance Company's (the "Escrow Holder" or "First American") representative confirm that Kyrene neither removed the Deed of Trust from the Property, nor deposited an executed deed to the Property before the scheduled Closing Date. (Doc. 225-1 at 11; Doc. 225-6 at 15–19.) The deposition transcripts also confirm that Kyrene neither deposited the necessary documents into escrow, nor signed the required forms as required under the PSA. (Doc. 225-1 at 11–13; Doc. 225-6 at 13–28.) There is no dispute that the PSA required Kyrene to remove encumbrances from the Property and deliver documents required to close the sale, that Kyrene failed to do so, and that this failure constitutes a default under the PSA. (Doc. 237-4 at 6–7, 15; Doc. 225-1 at 11–13; Doc. 225-6 at 13–28.)

SDP also alleges that Kyrene breached the PSA by refusing to provide adequate assurances that it would close the deal.[2] This argument relies on Article 11.6 of the PSA, which states:

> Each party will, whenever and as often as it shall be requested to do so by the other party, execute, acknowledge and deliver . . . any and all such further conveyances, assignments, approvals, consents and any and all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement.

(Doc. 237-4 at 17.) To support this claim, SDP provides an email dated March 28, 2022, between its counsel, Mr. Nagle, and Mr. Stipp. In that email, Mr. Stipp, acting on behalf of Kyrene, explained that Kyrene was "in the process of preparing a notice of default and intent to terminate the purchase agreement." (Doc. 225-7 at 3.) Shortly thereafter, in early

---

[2] SDP both relies on the PSA and the Restatement (Second) of Contracts § 251 to support its argument. (Doc. 225.) Because the Court finds that the PSA expressly allows for adequate assurances the Court need not address the Restatement (Second) of Contracts § 251 argument.

April 2022, Mr. Stipp stopped communicating with SDP's representatives regarding documents and approvals that were necessary for closing. (Doc. 225-8 at 2–3.) Kyrene also stopped communicating with First American, despite First American's repeated emails and telephone calls requesting documents and information necessary for closing. (Doc. 225-6 at 13–28.)

SDP says that because Kyrene's representative, Mr. Stipp, stopped communicating with SDP's representatives, on April 21, 2022, it wrote to Kyrene and requested "adequate assurances from [Kyrene] that [Kyrene] will fully perform its obligations under the terms and conditions of the [PSA]." (Doc. 225 at 5–6; Doc. 1-3 at 13–14; Doc. 15 at 60.) To follow up, Mr. Nagle later "spoke with Mr. Stipp by telephone" and during that call "Mr. Stipp stated that he would not provide the requested adequate assurances, not only because he believed that [Kyrene] was not obligated to do so, but also because [Kyrene] did not intend to close the deal." (Doc. 225 at 5–6; Doc. 15 at 60–61.)

Kyrene discounts Article 11.6 of the PSA, arguing that it is a "boilerplate 'further assurances' provision" and "merely require[s] the parties to perform ministerial acts necessary to consummate the transaction" rather than "impose substantive contractual obligations on the parties, such as an obligation to respond to a demand for adequate assurances." (Doc. 237 at 20.) To support this proposition, Kyrene cites to several non-Arizona cases. *See Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 454 (6th Cir. 2016) (interpreting Kentucky state law); *ParaData Comput. Networks, Inc. v. Telebit Corp.*, 830 F. Supp. 1001, 1005 (E.D. Mich. 1993) (interpreting Michigan state law); *Boyd Grp. v. D'Orazio*, No. 14-CV-7751, 2015 WL 3463625, at *5 (N.D. Ill. May 29, 2015) (interpreting Illinois state law); *Davis v. Yageo Corp.*, 481 F.3d 661, 676 n. 10 (9th Cir. 2007) (interpreting California state law).

The Court finds Kyrene's argument unpersuasive. Arizona courts consistently hold that the "controlling rule of contract interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning is applicable." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791

(Ariz. Ct. App. 1993) (citing *Brady v. Black Mountain Inv. Co*., 459 P.2d 712, 714 (Ariz. 1969)). "A contract must be construed so that every part is given effect, and . . . [t]he court must apply a standard of reasonableness in contract interpretation." *Id.* (citing *Gesina v. Gen. Elec. Co*., 780 P.2d 1380, 1386 (Ariz. Ct. App. 1988)).

Article 11.6 begins with the phrase, "Each party will . . . .", with the word "will" indicating mandatory action. (Doc. 237-4 at 17.) It goes on to say that, "whenever and as often as it shall be requested to do so by the other party . . . ." (*Id.*) This phrase indicates that one of the parties can ask the other to take some action. Next, Article 11.6 states, "execute, acknowledge and deliver . . . "; again, indicating that one party can require the other to take some action. (*Id.*) Finally, the language applies to "any and all such further conveyances, assignments, approvals, consents and any and *all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement*." (*Id.* (emphasis added).) The plain meaning of this open-ended phrase is that at any time a party can be requested by the other to perform any act that is "necessary" to achieve the intent and purpose of the PSA. And what is the "intent and purpose"? To close the transaction, of course. The Court therefore finds that this language requires a party to provide adequate assurances of closing to the other party, when requested to do so.

This interpretation makes practical sense. To simply ignore Article 11.6, or to construe it as "boilerplate" as Kyrene suggests, would render this provision meaningless. The PSA memorialized a commercial real estate transaction. It included a Feasibility Study Period, akin to a due diligence period, whereby SDP had the opportunity to conduct further investigation of the property and determine if its economic and financial expectations were reasonable. Millions of dollars were on the line. As it turns out, Kyrene surreptitiously received a more attractive offer. It did not share this information with SDP, instead choosing to accuse SDP of breach and then "ghost" it and the escrow company. In the moment, SDP needed to know Kyrene's intentions. A request for adequate assurances is supported by the Article 11.6. Kyrene's failure to provide any assurances was a breach of the PSA.

### 2.      SDP's Conduct

SDP also moves for summary judgment as to Kyrene's assertions that SDP's conduct constituted a breach of the PSA and excused Kyrene from its obligations to close on the Property. (Doc. 225 at 14.) Kyrene argues that (a) SDP did not possess the financial capability as of the Effective Date, thus beaching the PSA and fraudulently inducing Kyrene to enter the PSA; (b) SDP breached the PSA when it conducted "tenant interviews"; (c) SDP's due diligence and purported post-closing plans violated the PSA; (d) SDP's attempt to negotiate the purchase price was an anticipatory repudiation, and (e) SDP repudiated the PSA when it tried to force out certain tenants. (Doc. 225 at 14–18.) None of these contentions have merit.

### a.      SDP's Financial Capability

Article 8.1 of the PSA explains that "Purchaser represents and warrants to Seller as of the Effective Date and as of Close of Escrow, the matters provided in this Section 8.1." (Doc. 237-4 at 10.) Article 8.1.4 states "Purchaser has the financial capability to purchase the Property." (*Id.*) SDP and Kyrene disagree over the meaning of "financial capability."

SDP argues that "it is undisputed that SDP appeared at closing with sufficient funds to close the transaction: $4.5 million in cash deposited in escrow, and a loan for $17 million more, which it was prepared to deposit in escrow upon any indication that Kyrene actually intended to close." (Doc. 225 at 14–15; Doc. 225-3 at 5–9; Doc. 225-4 at 16.) Kyrene, in response, maintains that SDP did not have the financial capability to purchase the Property on the Effective Date, and as such, SDP breached a material condition of the PSA and fraudulently induced Kyrene to enter into the PSA. (Doc. 237 at 9–13.) Kyrene argues that SDP's "fraud in the inducement precludes summary adjudication." (Doc. 237 at 9.) Kyrene interprets that Article 8.1.4 of the PSA as "SDP 44 represented and warranted that it had the 'financial capability' to purchase the Property ***as of the 'Effective Date'*** of the PSA – which was November 17, 2021." (*Id.* at 10 (emphasis in original).) Kyrene argues that SDP 44 did not possess assets, income, or credit on the Effective Date, and that its successor, SDP, was "created to obtain financing . . . did not even exist until . . . months after the

Effective Date." (*Id.*) Kyrene argues that it would not have entered the PSA had it "known that SDP [] did not have the 'financial capability' to purchase the [P]roperty 'as of the Effective Date.'" (*Id.*)

Kyrene further argues that because "financial capability" is not defined in the PSA, at a minimum there is a "genuine dispute over the meaning of the undefined term . . . which precludes summary judgment." (*Id.* at 11.) But the Court disagrees because contract interpretation "is a question of law for the court where the terms of a contract are found to be plain and unambiguous . . . . Whether a contract is ambiguous is a question of law; the mere fact that parties disagree as to its meaning does not establish an ambiguity." *Chandler Med. Bldg. Partners*, 855 P.2d at 791 (internal citations omitted).

As previously explained, Arizona law provides that "[t]he controlling rule of contract interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning is applicable." *Id.* (citing *Brady*, 459 P.2d at 714). "A contract must be construed so that every part is given effect, and each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing. . . . The court must apply a standard of reasonableness in contract interpretation." *Id.* (citing *Gesina*, 780 P.2d at 1386).

When reviewing the PSA as a whole, the ordinary meaning of the phrase "has the financial capability" means that SDP 44, and later SDP, represented to Kyrene that, no later than the Effective Date, it had or would have access to the funds to close, whether it was cash in hand, liquid assets, or a credit facility. (Doc. 237-4.) This analysis turns on the meaning of the word "capability." Courts have found "capability," in the financial context, to mean the "*ability* to pay." *United States v. Buckner*, 9 F.3d 452, 454 (6th Cir. 1993) (emphasis added). This is consistent with Cambridge Dictionary's definition of capability, which is defined as "the ability to do something." *Capability*, Cambridge Business English Dictionary, (2011); *see also State ex rel. Morrison v. Nabours*, 286 P.2d 752, 755 (Ariz. 1955) ("In determining what the ordinary meaning of a word is no better source and authority is to be found than reference to a recognized dictionary.") (citing and relying

on Webster's New International Dictionary of the English Language)).

When "the provisions of the contract are plain and unambiguous upon their face," like they are here, "they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there." *In re Avondale Gateway Ctr. Entitlement, LLC*, No. CV10-1772-PHX-DGC, 2011 WL 1376997, at *1 (D. Ariz. Apr. 12, 2011) (citing *D.M.A.F.B. Fed. Credit Union v. Employer Mut. Liab. Ins. Co.*, 396 P.2d 20, 23 (Ariz. 1964)) (internal quotations omitted).

Because the Court interprets the phrase "has the financial capability" in the ordinary manner, which means a purchaser has the ability to raise finances or is "creditworthy," Kyrene's argument that SDP breached the PSA or that Kyrene was fraudulently induced to enter the PSA both fail. First, SDP has shown that it received financing and had $18 million ready to pay at the closing. (Doc. 225 at 14–15; Doc. 225-3 at 5–9; Doc. 225-4 at 16.) Next, given this interpretation and evidentiary record, no reasonable jury could conclude that SDP 44 and later SDP *knew* that it was incapable of raising the capital necessary to close. *Sonoran Res., LLC v. Oroco Res. Corp.*, No. CV-13-01266-PHX-JJT, 2015 WL 11089497, at *11 (D. Ariz. Apr. 17, 2015) ("In view of the undisputed evidence, no reasonable jury could conclude that Oroco had the requisite intent to engage in fraudulent concealment."); *see also Gordon Grado M.D., Inc. v. Phoenix Cancer & Blood Disorder Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 813 (D. Ariz. 2022).

### b.    Tenant Interviews

Kyrene argues that SDP materially breached the PSA or, at minimum, breached the implied covenant of good faith and fair dealing, by contacting and interviewing tenants of the Property. SDP argues that no provision of the PSA prohibits such interviews and that this cannot constitute a breach; Kyrene responds that SDP could not contact tenants absent an express right in the PSA. (Doc. 225 at 18; Doc. 237 at 4–5.) The Court agrees with SDP.

Kyrene has not and cannot identify an express term or a provision in the PSA that precludes SDP from conducting tenant interviews because no such provision exists. (Doc.

237.) There can be no material breach of contract when the contract itself is silent on such conduct. *See Graham v. Asbury*, 540 P.2d 656, 657 (Ariz. 1975). With respect to Kyrene's argument that SDP's conduct was "at the very least" a breach of the implied covenant of good faith and fair dealing, which constitutes "the 'first material breach' of the PSA" and could "excuse Kyrene's performance," the Court is similarly unpersuaded. (Doc. 237 at 14.) The only authority Kyrene cites to support this proposition is *Coates v. Heat Wagons, Inc*., 942 N.E.2d 905 (Ind. Ct. App. 2011), an Indiana state case that analyzes a plaintiff's affirmative breach of the implied covenant cause of action—not a defense in response to a motion for summary judgment like Kyrene has raised here. The Court finds that SDP's tenant interviews did not constitute a breach of the PSA.

### c.    SDP's Due Diligence & Post-Closing Plans

Kyrene also argues that SDP breached the PSA by marketing the Property prior to closing. But Kyrene again fails to cite to any term in the PSA that precludes such conduct, or any authority to support that this constitutes a "material breach of the implied covenant." (Doc. 237 at 15.)

### d.    SDP's March 11, 2022, Email

Kyrene argues that in March 2022, "SDP told Kyrene that it could not pay the purchase price" and "[a]t that point, SDP breached." (Doc. 237 at 15.) When reviewing the email from Mr. Malin to Mr. Stipp, it is clear that Mr. Malin explains that his "loan is approved, but StanCorp will not give me credit for 3 month to month leases or the Mexican restaurant that vacated the center," which "lowers the value of the center by approximately $1.7M." (Doc. 237-54 at 3.) Mr. Malin explains that he "want[s] to try and make this deal work," and "respectfully request[s] [Kyrene] to agree to the following items . . . $1.7M reduction in the purchase price to cover the lost value." (*Id.* at 4.) This email represents an effort to negotiate a reduction in the purchase price, not an indication that SDP would renege on the deal. It was not a breach of the PSA.

### e.    Leases & Estoppel Certificates

Kyrene argues that SDP "has repeatedly tried to force LA Laser out, including by

proffering false testimony about Malin's December 1, 2021 telephone call with Stipp" and that such conduct violates Articles 9.1.4 and 9.2.4 of the PSA. (Doc. 237 at 15.) This argument lacks merit because both Articles 9.1.4 and 9.2.4 of the PSA discuss the "Seller's Representations and Warranties," which in this case, means Kyrene—not SDP. (Doc. 237-4 at 12, 14 ("As a material inducement to Purchaser to enter into this Agreement, Seller represents and warrants . . . [e]ach of the Leases is valid and subsisting . . . Seller will not sell, exchange, assign, transfer, convey, encumber, or otherwise dispose of all or any part of the Property . . .").)

Similarly, Kyrene argues that SDP repudiated the PSA when SDP "unequivocally told Kyrene that it could not close without estoppel certificates from certain tenants— certificates that Kyrene was not obligated to provide" and relies on Article 5.2(g) of the PSA. (Doc. 237 at 15.) Article 5.2(g) describes Kyrene's obligations under the PSA, not SDP's. (Doc. 237-4 at 7 ("No later than thirty (30) days before the end of the Feasibility Study Period, Seller will deliver to Purchaser estoppel certificates . . .").)

Both arguments lack merit because SDP cannot have breached a provision that applies to Kyrene, and Kyrene has failed to cite to any authority suggesting otherwise.

In conclusion, none of SDP's conduct, as alleged by Kyrene, establishes a breach of the PSA or a defense that precludes judgment from being entered at this juncture.

### B.     Breach of the Implied Covenant of Good Faith

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002) (en banc). "Such implied terms are as much a part of a contract as are the express terms." *Id.* (citing *Golder v. Crain*, 437 P.2d 959, 961 (Ariz. Ct. App. 1968)). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement. The duty arises by operation of law but exists by virtue of a contractual relationship." *Id.* (internal citation omitted).

In its Third Amended Complaint, SDP alleges that Kyrene breached the covenant

of good faith and fair dealing by "intentionally and willfully" engaging "in a series of acts which deprive SDP of its benefit of the bargain." (Doc. 221 ¶ 34.) SDP's theory of liability is limited to Kyrene's conduct in this litigation.[3] (*Id.* at ¶¶ 35–44.) For example, SDP alleges "Kyrene has repeatedly and baselessly asserted that SDP breached the PSA . . . delaying the resolution of Kyrene's request for specific performance," and has "used the discovery mechanisms in this lawsuit to learn the details of SDP's redevelopment plans for the property, to allow it to redevelop the [P]roperty on its own." (*Id.* at ¶¶ 35–36.) As another example, SDP claims that once Kyrene learned at the preliminary injunction evidentiary hearing that a 10-year lease with LA Laser would "ruin" SDP's business development plan with the Property, "Kyrene suddenly produced a purportedly signed copy of a lease between Kyrene and LA Laser." (*Id.* ¶¶ 40–41.) SDP alleges that Kyrene has "asserted (and has continued to assert) that, notwithstanding its prior denials of the existence of such a lease, any transfer of the Property to SDP would be subject to the newly-produced lease." (*Id.* ¶ 41.) SDP further alleges that "Kyrene was aware that the newly-produced [LA Laser] lease, if enforceable against SDP after conveyance, would make SDP's original plans for redevelopment of the property either impossible, or so significantly more expensive that SDP might abandon the transaction." (*Id.* ¶ 42.)

Kyrene believes that it is entitled to summary judgment on this issue because, as a matter of law, litigation conduct cannot formulate the basis of a good faith and fair dealing claim. (Doc. 228 at 30.) Kyrene argues that "once a defendant is sued, it is entitled to defend itself, using the same tactics available to other civil litigants." (*Id.*) And that "[n]o Arizona court has ever held outside the insurance context that the defendant had a continuing duty to perform contractual obligations after it has been sued for breach of contract." (*Id.* at 31.)

SDP, in its response brief, argues that the "litigation privilege does not preclude a

---

[3] In one allegation, SDP alleges that Kyrene breached the implied covenant "prior to the scheduled closing date" because "SDP breached the PSA, and that as a result [it] has no obligation to convey the Property to SDP on the terms set out in the PSA." (Doc. 221 ¶ 35.) This allegation, however, merely repeats that Kyrene breached the PSA for its failure to close; and, as such, cannot support SDP's breach of implied covenant of good faith and fair dealing claim. *See, e.g.*, *Calhoun v. Allstate Ins. Holdings LLC*, No. CV-19-04932-PHX-SRB, 2021 WL 1916838, at *6 (D. Ariz. Apr. 12, 2021).

claim related to Defendants' litigation conduct" and cites to several cases to attempt to save its "bad faith litigation" conduct claim. (Doc. 236 at 18–19.) Those cases, however, are unpersuasive as they do not involve a breach of the implied covenant of good faith and fair dealing claim, nor do they involve a similar commercial transaction. Rather, the majority of cases SDP relies on involve malicious prosecution, abuse of process, or bad faith insurance claims. *See Giles v. Hill Lewis Marce*, 988 P.2d 143 (Ariz. Ct. App. 1999) (suit for abuse of process and malicious prosecution); *Sierra Madre Dev., Inc. v. Via Entrada Townhouses Ass'n*, 514 P.2d 503, 507 (Ariz. Ct. App. 1973) (holding that the litigation privilege precluded the libel claim, which was based on defamatory statements contained in pleadings, but did not apply to claims for malicious prosecution or abuse of process); *Stewart v. Fahey*, 481 P.2d 519, 521 (Ariz. Ct. App. 1971) (holding that action for slander of title, which was based on defendant's filing of a lis pendens, was barred by the litigation privilege); *see also Tucson Airport Auth. v. Certain Underwriters at Lloyd's, London*, 918 P.2d 1063, 1066–67 (Ariz. Ct. App. 1996) ("We hold, therefore, that in the circumstances presented in this case, [plaintiff] sufficiently pled a bad faith claim that is based on unprivileged conduct by its insurers.")

SDP also generally cites to *Huffman v. JP Morgan Chase Bank, NA*, No. CV-22-00903-PHX-JJT, 2023 WL 2691455 (D. Ariz. Mar. 29, 2023) and *Goldman v. Sahl*, 462 P.3d 1017, 1021 (Ariz. Ct. App. 2020), for the proposition that "courts have routinely held that the litigation privilege does not preclude an action for improper litigation conduct" and that there is a distinction between communication and conduct. (Doc. 236 at 18.) Neither case, however, saves SDP's claim because neither involved a breach of the implied covenant of good faith and fair dealing. In *Goldman*, the causes of action were defamation and abuse of process against an attorney. 462 P.3d at 1024. There, the court clarified the exception between improper litigation conduct and communication, which SDP relies on, is for specific causes of action like "wrongful use of a civil proceeding, malicious prosecution, and abuse of process." *Id.* at 1029 n.5, 1033–34. Arizona courts dismiss claims that do not fall within this exception, and SDP has not cited to a case in either its response

brief or at oral argument that holds otherwise. *See Linder v. Brown & Herrick*, 943 P.2d 758, 766 (Ariz. Ct. App. 1997) (finding that plaintiffs' fraud and intentional infliction of emotional distress claims "against opposing counsel fail to comprise recognized causes of action"); *see also Huffman*, 2023 WL 2691455, at *5 (dismissing plaintiff's conversion and intentional infliction of emotional distress because the allegations were covered by Arizona's litigation privilege).

SDP's breach of the implied covenant and good faith claim primarily rests on allegations of Kyrene's litigation conduct. (Doc. 221 ¶¶ 35–44.)[4] Arizona case law is clear that the litigation privilege bars a claim that does not fall within the narrow exception of a wrongful use of a civil proceeding, malicious prosecution, or abuse of process claim. The Court will grant summary judgment in Kyrene's favor with respect to SDP's claim for breach of the implied covenant of good faith and fair dealing.

### C.    Promissory Estoppel

SDP asserts a promissory estoppel claim against Kyrene and LA Laser on the premise that a Kyrene and LA Laser representative, Mr. Stipp, represented to Mr. Malin that "he did not want to do anything that would jeopardize the sale to SDP," and "promised that there would be no lease effective between Kyrene and LA Laser when SDP purchased the [P]roperty." (Doc. 221 ¶ 63.) SDP alleges that Mr. Stipp's representation was made on December 1, 2021, which occurred during the Feasibility Study Period. (*Id.*) SDP alleges that it "reasonably believed that [Mr.] Stipp was acting on behalf of both Kyrene and LA Laser" because both entities are "solely owned by [Dr.] Taheri." (*Id.*)

Kyrene and LA Laser move for summary judgment on SDP's promissory estoppel claim because, they argue, it is foreclosed by the PSA, "an express, written contract on the same subject matter." (Doc 228 at 19.) Defendants argue that this "rule applies regardless of whether there is a direct conflict between the written contract and the extra-contractual promise." (*Id.* at 20.) Defendants also argue that SDP's promissory estoppel claim fails because the PSA is a fully integrated agreement that can be amended only by a subsequent

---

[4] SDP conceded this point at oral argument.

written agreement. (*Id.* at 21–22.) SDP, in response, argues "[n]o provisions of the PSA address whether there is or is not an executed lease between LA Laser and Kyrene, or whether there would be such a lease at closing," and the PSA's integration clause "makes it clear that it integrates only past statements or understandings between the parties." (Doc. 236 at 6–18.)

"The elements of promissory estoppel are a promise, which the promissor should reasonably foresee would cause the promisee to rely, upon which the promisee actually relies to his detriment." *Univ. Med. Ctr. Corp. v. Aetna Life Ins. Co.*, No. CV-10-535-TUC-RCC, 2011 WL 13233485, at *4 (D. Ariz. Dec. 6, 2011) (citing *Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 736 P.2d 13, 16 (Ariz. Ct. App. 1987)) (internal quotations omitted). "Where there is an express contract dealing with the same subject matter that is the subject of a promissory estoppel claim, promissory estoppel is not available to alter or contradict the terms of the express contract." *Id.* (citing *Loffa v. Intel Corp.*, 738 P.2d 1146, 1153 n.3 (Ariz. Ct. App. 1987)).

Here, Articles 9.1.4 and 11.7 of the PSA explain that there are valid "tenant leases" that are in "full force and effect" and that any amendments shall be in writing. Sophisticated, represented parties agreed to the terms after rounds of negotiations. The alleged promise—that there would be no lease effective between Kyrene and LA Laser when SDP purchased the Property—addresses the same subject matter as the PSA.

Articles 9.1 and 9.1.4 of the PSA expressly state that "[Kyrene] represents and warrants to [SDP]" that "[e]ach of the Leases is valid and subsisting and in full force and effect in accordance with its terms and constitutes the legal, valid, binding, and enforceable obligation of the tenant thereunder," that "each tenant has accepted the premises covered by its Lease and is in possession of such premises in accordance with its Lease," and "[n]o tenant has given any notice to Seller of intention of . . . terminating its tenancy. . . ." (Doc. 237-4 at 12.)

Further, Article 11.7 of the PSA states,

> [The PSA],together with the other written agreements referred to herein, is intended by the parties to be the final expression

- 17 -

> of their agreement with respect to the purchase and sale of the Property and is intended as the complete and exclusive statement of the terms of the agreement between the parties.

(*Id.* at 17.) It goes on to say that the PSA "supersedes any and all prior understandings between the parties, whether oral or written" and that "[a]ny amendments to this Agreement must be in writing and signed by both parties." (*Id.*)

By its terms, Article 9.1.4 makes clear that any leases existing at the time of the PSA, including the LA Laser Lease, were valid and "in full force and effect." (*Id.* at 12.) To that same effect, Article 11.7 also expressly states that the PSA is the "final expression of their agreement" and "[a]ny amendments to this [PSA] must be in writing and signed by both parties." (*Id.* at 17.) Mr. Stipp's purported promise "that there would be no lease effective between Kyrene and LA Laser when SDP purchased the [P]roperty," references the same subject matter, and to be effective, must have been "in writing and signed by both parties." (Doc. 221 ¶ 63; Doc. 237-4 at 17.) SDP's promissory estoppel claim fails, and the Court will grant summary judgment in Kyrene's favor with respect to SDP's claim for promissory estoppel. *See Tohono O'odham Nation v. Ducey*, 174 F. Supp. 3d 1194, 1208 (D. Ariz. 2016) (dismissing the promissory estoppel claim because the "alleged promise addresses the same subject matter"); *see also Chanay v. Chittenden*, 563 P.2d 287, 290 (Ariz. 1977) ("There can be no implied contract where there is an express contract between the parties in reference to the same subject matter.") (citations omitted).

### D. Damages

Kyrene moves for summary judgment in its favor that SDP cannot both seek specific performance and damages, nor can SDP seek damages exceeding $50,000. (Doc. 228 at 14–19.) Kyrene argues that it and SDP contracted for and agreed to the "types of damages either party could obtain in the event of the other party's material breach" and that under Arizona law, the PSA governs. (*Id.* at 16.) SDP does not squarely address Kyrene's argument. Rather, in its response brief, SDP argues that "[w]here a frustrated purchaser of real property is entitled to specific performance, the equitable remedy of specific performance includes all types of relief as may be necessary to grant complete relief." (Doc.

236 at 3.) SDP also argues "where defendant acts in bad faith—in breach of the covenant of good faith and fair dealing—damage limitations are not enforced." (*Id.* at 5.) Because the Court will dismiss SDP's breach of the implied covenant of good faith and fair dealing claim, (*supra*, Section III.B) it need only address whether SDP is entitled to relief beyond specific performance for its breach of contract claim.

Article 10.4 of the PSA states that:

> In the event of the occurrence of a Seller Default occurring prior to the Close of Escrow, Purchaser's sole remedy shall be to pursue one and only one, of the following remedies:
>
> (i) to waive such default;
>
> (ii) extend the time for performance by such period of time as may be mutually agreed upon in writing by the Parties hereto;
>
> (iii) to terminate this Agreement; and upon such termination, the Deposit will be returned to Purchaser, and Seller will reimburse Purchaser for its reasonable, out of pocket expenses, in an amount not to exceed $50,000.00; or
>
> (iv) to seek specific performance of Seller's obligation to convey the Property to Purchaser, so long as such action for specific performance is filed in a court of law of competent jurisdiction in the State of Arizona, Maricopa County, within sixty (60) days following a Seller Default; provided, however, solely in the event specific performance is unavailable as a remedy to Purchaser, then the Deposit will be refunded to Purchaser, and Purchaser may pursue a claim against Seller for its reasonable, out of pocket expenses, in an amount not to exceed $50,000.

(Doc. 228-4 at 16.)

SDP elected to seek specific performance when it initiated litigation. (Doc. 1-2.) In the Third Amended Complaint, SDP alleges that it:

> [S]eeks, and is entitled to, specific performance under the PSA, including conveyance of the property and any other relief necessary to place SDP in the position it should have been in, and the Property in the condition it was required to be delivered, on May 16, 2022, including monetary relief . . . [h]ere, an additional monetary award is required as part of the remedy of specific performance, to compensate for injury to the freehold Kyrene must deliver pursuant to a decree of specific performance.

(Doc. 221 ¶ 31.)

1    Arizona contract law "seeks to preserve freedom of contract and to promote the free

2    flow of commerce" and that "[t]hese goals are best served by allowing the parties to specify

3    the consequences of a breach of their agreement." *Flagstaff Affordable Hous. Ltd. P'ship*

4    *v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010) (en banc). "The parties to a contract

5    may specify certain remedies which may be used in case of breach. They may in addition

6    make such a provision the exclusive remedy or remedies, barring all others which would

7    otherwise be available." *Zancanaro v. Cross*, 339 P.2d 746, 750 (Ariz. 1959). "To obtain

8    this result, however, the intent of the parties must be made clear." *Id.* To decipher the intent

9    of the parties, and whether a contract provision bars other remedies, courts look to the

10   contract. *See id.*

11   When a contract's remedial term provides that the non-breaching party "may"

12   pursue a listed remedy, the language does not preclude the non-breaching party from

13   pursuing other remedies available at law. This is so even if the remedy is not identified in

14   the contract. In *Zancanaro v. Cross*, the Arizona Supreme Court was unconvinced that

15   where a clause explained "that the [plaintiff] 'may, at his option' do certain things, but []

16   does not provide that he may not do anything else" that it "operates to bar plaintiff from

17   other possible remedies for defendant's breach." *Id.* at 749–50. Similarly, the court in

18   *Franchise Holding II LLC v. Huntington Restaurants Group Inc.*, No. CV-12-01363-PHX-

19   DGC, 2014 WL 61476 (D. Ariz. Jan. 8, 2014), relying on *Zancanaro v. Cross*, concluded

20   "that the parties did not clearly intend to designate enforcement of the judgment as the sole

21   remedy available under the Stay Agreement" because "the Stay Agreement provided that

22   [p]laintiff '*may*, without notice, seek to collect or otherwise enforce' the judgment." 2014

23   WL 61476, at *3 (emphasis in original).

24   In contrast, when the remedial term uses the word "shall," courts interpret this as

25   declaring the exclusive remedy. In *Green v. Snodgrass*, 289 P.2d 191 (Ariz. 1955), the

26   contract specified that "[i]n event the . . . purchaser failes [sic] to comply with his part of

27   this contract, then the earnest money (of $5000) receipted for herein *shall* be forfeited and

28   divided equally between the Seller and Green Realty Co., Real Estate Broker." *Id.* at 192

(emphasis added). The court explained that such mandatory language "provide[d] what the rights of the parties to the contract shall be in the event of a breach." *Id.* at 193. Similarly, in *Hadley v. Southwest Properties, Inc.*, 570 P.2d 190 (Ariz. 1977), the Arizona Supreme Court explained, "[t]he clear intent of the parties here was that the only remedy the plaintiffs would have in the event of breach was forfeiture . . . [t]hat remedy was exercised; plaintiffs can seek no further damages against either defendant." *Id.* at 193.

Here, the parties agreed that "[i]n the event of the occurrence of a Seller Default occurring prior to the Close of Escrow, Purchaser's *sole remedy shall* be to pursue *one, and only one*, of the following remedies . . . " (Doc. 228-4 at 16 (emphasis added).) The PSA's remedial term clearly limits the parties' remedies to those identified in the contract.

SDP does not offer a competing interpretation, or even attempt to distinguish *Hadley v. Southwest Properties, Inc.*, or *Zancanaro v. Cross*. Rather, it relies on Arizona common law for the proposition that "compensatory damages and specific performance can be awarded simultaneously in limited circumstances." (Doc. 236 at 3 (citing *Cnty. of La Paz v. Yakima Compost Co.*, 233 P.3d 1169, 1189 (Ariz. Ct. App. 2010)).) SDP also argues that a court may order both damages and specific performance if specific performance "does not afford complete relief." *Cnty. of La Paz*, 233 P.3d at 1189; *see also Woliansky v. Miller*, 704 P.2d 811, 813 (Ariz. Ct. App. 1985) ("[A] party who elects specific performance may also be awarded equitable damages when the decree does not afford complete relief."). Those cases, however, did not include a contract with a remedial term specifying that the "*sole remedy shall* be to pursue *one and only one*, of the following remedies. . . " in the event of default. (Doc. 228-4 at 16 (emphasis added).)

Article 10.4(iv) of the PSA states that "solely in the event specific performance is unavailable as a remedy to [SDP], then the Deposit will be refunded to [SDP], and [SDP] may pursue a claim against [Kyrene] for its reasonable, out of pocket expenses, in an amount not to exceed $50,000." (*Id.*) This provision explicitly states that SDP cannot seek both specific performance and damages, or damages exceeding $50,000. (*Id.*) "The courts may not be used to rewrite a contract, and a claimant cannot receive more than he originally

1    bargained for." *Port United Inc. v. Sestus LLC*, No. CV-11-00367-PHX-ROS, 2014 WL

2    12521331, at *3 (D. Ariz. Sept. 29, 2014). The court will grant summary judgment in favor

3    of Kyrene and dismiss SDP's request for damages in addition to specific performance; or,

4    in the event specific performance is unavailable, damages exceeding $50,000.00.

5            **E.    Specific Performance**

6            As explained above (*supra* III.D), Article 10.4 of PSA explains that if Kyrene were

7    to default under the PSA prior to the closing, SDP's "sole remedy shall be to *pursue* one

8    and only one, of the following remedies . . . *to seek* specific performance of [Kyrene's]

9    obligation to convey the Property to [SDP], so long as such action for specific performance

10   is filed in a court . . . in the State of Arizona, Maricopa County. . . ." (Doc. 228-4 at 16

11   (emphasis added).) SDP, exercising its rights under the PSA, elected to seek specific

12   performance when it initiated this action in Arizona Superior Court. (Doc. 1-2.) Both

13   parties now cross-move for summary judgment on this issue. (Docs. 225, 228.)

14           Specific performance "is 'an equitable remedy which is extraordinary and

15   dependent upon the sound discretion of the court.'" *Dialog4 Sys. Eng'g GmbH v. Cir. Rsch.*

16   *Labs, Inc.*, 622 F. Supp. 2d 814, 824 (D. Ariz. 2009) (citing *Glad Tidings Church v.*

17   *Hinkley*, 226 P.2d 1016 (Ariz. 1951)). To obtain specific performance,

18               Typically, there are five requirements: (1) there must be a
                 contract; (2) the terms of that contract must be certain and fair;
19               (3) the party seeking specific performance must not have acted
20               inequitably; (4) specific enforcement must not inflict hardship
                 on the other party or public that outweighs the anticipated
21               benefit to the party seeking specific performance; and (5) there
22               must be not adequate remedy at law.

23   *Id.* (quoting *Power P.E.O., Inc. v. Employees Insurance of Wausau*, 38 P.3d 1224 (Ariz.

24   2002)).

25           By its terms, Article 10.4 of the PSA allows for SDP to pursue specific performance

26   in a court of law but does not entitle SDP to specific performance outright. SDP and

27   Kyrene, as the moving parties, must prove why they should prevail on the issue of equitable

28   relief in the form of specific performance. Summary judgment can be granted only if a

moving party who bears the burden of proof shows that there is no genuine issue of fact—that there is no basis upon which a jury could find for the nonmoving party. *See* Fed. R. Civ. P. 56(a). As one court has explained: where a movant who seeks summary judgment "on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

Kyrene, albeit briefly, addresses the merits of specific performance but does not address the applicable factors. (Doc. 228 at 29–30.) Rather, Kyrene argues that because SDP's representative, Mr. Malin, testified during his deposition that a LA Laser lease could potentially halt its business plans, SDP has shown that it is "not ready, willing, and able to close" if the LA Laser lease is upheld. (Doc. 228 at 30.) The Court has reviewed the relevant portions of Mr. Malin's transcript and finds that the parties were speaking in hypotheticals. (Doc. 237-10 at 8–11 ("I mean, it's a hypothetical you are asking me. . . . I don't do well with double hypotheticals. Sorry.").)

In its motion, SDP initially asks the Court to enter judgment in its favor that "the conduct of SDP asserted by Kyrene does not constitute a bar to the remedy of specific performance." (Doc. 225 at 19.) Then, in its reply brief, SDP, for the first time argues that it "is entitled to specific performance" and briefly argues in one paragraph how it believes there is no adequate remedy at law. (Doc. 241 at 2, 13–15.) Although "[i]t is well established that issues cannot be raised for the first time in a reply brief" the Court will briefly explain why SDP has failed to meet its burden that it is entitled to specific performance. *Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n. 2 (9th Cir. 2007).

As a threshold matter, it is unclear to the Court what SDP asks for on summary judgment. (Docs. 225, 241.) To the extent that SDP believes that, once it is determined that Kyrene breached the PSA, it is *ipso facto* entitled to specific performance, that argument also fails because that position lacks support in the PSA's language. Article 10.4 provides

that SDP can "pursue" the remedy of specific performance. (Doc. 228-4 at 16.) Pursue means to "try to obtain or accomplish, to work to bring about, to strive for (a circumstance, event, condition, etc.); to seek after, aim at." *Pursue*, OXFORD ENGLISH DICTIONARY, (2023). A professional baseball team may open the season in pursuit of the World Series title. But without proving themselves throughout the regular season and winning games in the post season, the team will not achieve that desired outcome. Had the parties agreed that specific performance would apply by operation of law upon breach, the language would be different. For example, the PSA could have said that, upon Kyrene's breach, "SDP is entitled to specific performance." The parties, however, chose other language.

Thus, under Article 10.4 of the PSA, SDP can go to court. If it proves the threshold issue of breach, and specific performance is the chosen remedy, SDP must then convince the Court that it is entitled to that remedy under the law. The Arizona Supreme Court has identified a multi-factor test for specific performance. Neither party addresses the test. For that reason, neither party has met its burden here, and, on this issue, the Court will deny both motions.

## F.    Kyrene's Counterclaim

Kyrene asserts a single counterclaim: declaratory judgment. (Doc. 223.) It seeks a "declaration that the LA Laser Lease is a valid and enforceable agreement between Kyrene and LA Laser in accordance with its terms" and if SDP acquires the Property pursuant to the PSA, "the LA Laser Lease will survive, SDP will not have the right to either terminate the LA Laser Lease or lock LA Laser out . . . prior to December 31, 2026, or December 31, 2036 if LA Laser exercises its right [to] renew the Lease except as provided for in the lease." (*Id.* at ¶ B.) Kyrene purportedly moves for summary judgment on its counterclaim because it writes as such in its heading, but nowhere in its motion does it argue why it should be entitled to judgment in its favor. (Doc. 228 at 19–29.) The Court will deny Kyrene's purported request to enter judgment in its favor with respect to its declaratory judgment counterclaim.

**IV.     CONCLUSION**

Accordingly,

**IT IS ORDERED** granting in part and denying in part SDP's Motion for Partial Summary Judgment (Doc. 225). Summary judgment is granted in favor of SDP with respect to its breach of contract claim in that (1) Kyrene breached the PSA and (2) Kyrene's refusal to close is not excused by SDP's conduct. The Court denies SDP's Motion (Doc. 225) in all other respects.

**IT IS FURTHER ORDERED** granting in part and denying in part Kyrene and LA Laser's Motion for Summary Judgment (Doc. 228). Summary judgment is granted in favor of Kyrene with respect to the breach of implied covenant of good faith and fair dealing claim, the promissory estoppel claim, and that SDP cannot both seek specific performance and damages, nor can SDP seek damages exceeding $50,000. The Court denies Kyrene and LA Laser's Motion in all other respects.

**IT IS FURTHER ORDERED** that the preliminary injunction currently in place (Doc. 132) shall remain in effect until the issue of specific performance has been resolved.

**IT IS FURTHER ORDERED** that the parties shall be prepared to address whether the remaining issues of specific performance and Defendants' counterclaim should be tried by bench or by jury at the Trial Setting Conference currently set for November 16, 2023, at 2:30 p.m. (Arizona time) (Doc. 253).

Dated this 7th day of November, 2023.

Michael T. Liburdi
United States District Judge